ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
IBM CORPORATION,                                    :
                Plaintiff,              :
                               :
v.                                                  :
                               :
MICRO FOCUS (US), INC.,                             :
                Defendant.              :
--------------------------------------------------------------x

**OPINION AND ORDER**

22 CV 9910 (VB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Briccetti, J.:

    Plaintiff IBM Corporation brings this action against defendant Micro Focus (US), Inc.,

alleging Micro Focus, without authorization, copied and reverse engineered IBM's proprietary

software to create derivative software applications, in violation of federal copyright law and in

breach of its contracts with IBM.

    Now pending are Micro Focus's motions to (i) dismiss the amended complaint pursuant

to Rule 12(b)(6) (Doc. #56), and (ii) disqualify IBM's counsel, Kirkland and Ellis LLP

("Kirkland"), from representing IBM in this action.  (Doc. #22).[1]

    For the reasons set forth below, the motion to dismiss is GRANTED IN PART and

DENIED IN PART, and the motion to disqualify is DENIED.

    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

## BACKGROUND

I.    Factual Allegations

    For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-

pleaded factual allegations in the amended complaint, and draws all reasonable inferences in

plaintiff's favor, as summarized below.

---

[1]    Kirkland is represented by separate counsel, Williams & Connolly LLP, for purposes of
the motion to disqualify.

IBM alleges it provides mainframe computer systems to its clients, including banks, airlines, and government agencies.  The mainframe systems include IBM's "proprietary computers and software." (Doc. #39 ("FAC") ¶ 2).  IBM alleges this software, the CICS Transaction Server for z/OS software ("CICS TS") is "a general-purpose application server and transaction processing subsystem" that provides "services for running applications online, by request, at the same time as many other users are submitting requests to run the same applications, using the same programs and resources such as files and databases." (Id. ¶¶ 20, 21).  Thus, the mainframe software represents "a collection of related programs that together perform a business operation, such as processing a travel request or preparing a company payroll." (Id. ¶ 21).

IBM further alleges CICS TS enables its customers' applications to work online and across mobile and networked devices through CICS TS Web Services, which "are part of the [CICS TS] computer program." (FAC ¶ 23).  CICS TS Web Services uses a "web service binding file," also known as a WSBIND file, to enable networked devices to access CICS TS applications.  (Id. ¶ 24).

IBM claims it holds the copyrights for CICS TS, including CICS TS Web Services and related components, and attaches to the amended complaint copies of copyright registration certificates for nine versions of the "IBM CICS TRANSACTION SERVER FOR z/OS." (Doc. #39-1 (the "Registrations")).[2]

Through the "IBM PartnerWorld program," IBM collaborates with third-party software developers to "improve, promote, and expand the digital products and services available to their

---

[2]      One of the Registrations registers a version of the "IBM CICS Transaction Server." (Registrations at ECF 24).

mutual customers." (FAC ¶¶ 30, 32).  Participants in the PartnerWorld program allegedly enter

into an agreement with IBM called the "IBM PartnerWorld Agreement and Value Package

Attachment" (the "PartnerWorld Agreement"), which provides participating developers with

discounted access to IBM software but sets certain limits on the developers' use of the software.

(Id.).

   Likewise, IBM alleges its "z/OPD Developer Discount Program" gives third-party

developers discounted access to IBM's mainframe software, but requires them to enter into three

agreements:  (i) IBM's Client Relationship Agreement (the "CRA"); (ii) Attachment for

Developer Discount – IBM Z (the "CRA Attachment"); and (iii) Addendum to the Attachment

for Developer Discount for IBM Z (the "CRA Addendum").  (Id. ¶ 33).

   Through these agreements, participating software developers agree to "use their access

solely to develop or enhance software that runs on IBM's mainframe platform and otherwise

only for the mutual benefit of the parties and their customers."  (FAC ¶ 34).  Thus, they promise

not to "us[e] any of the elements of the Program or related licensed material separately from the

Program" (id. (quoting CRA § 1.b.4)); "'reverse assembl[e], reverse compil[e], translat[e], or

reverse engineer[ ]' IBM's software" (id. (quoting CRA § 1.b.3 and citing CRA § 5.a.4)); or "use

their preferred access and the IBM software licensed to them under the Developer Discount

Program to undermine IBM's mainframe systems." (Id. (citing CRA Attachment §§ 2.f, 2.j,

5.b)).

   According to IBM, Micro Focus participated in the PartnerWorld and Developer

Discount programs, and agreed to the terms of the PartnerWorld Agreement, the CRA, the CRA

Attachment, and the CRA Addendum.  However, Micro Focus allegedly copied and reverse

engineered parts of CICS TS to create competing software applications called Micro Focus

Enterprise Server and Micro Focus Enterprise Developer (together, the "Micro Focus Enterprise

Suite"), thereby violating its agreements with IBM.

Specifically, IBM claims the Micro Focus Enterprise Suite includes a "web services

implementation" with a WSBIND file for mapping data that copies IBM's WSBIND file, and

that "the numerous similarities in the file indicate that other portions of Micro Focus Enterprise

Suite were copied from IBM as well." (FAC ¶ 38). The alleged similarities include:

- Micro Focus's WSBIND file contains near identical architecture and design to IBM's CICS® TS WSBIND file.
- Micro Focus's WSBIND file uses IBM internal structures that are not available outside of IBM.
- For a given input schema or data structure, the log file generated from the Micro Focus Enterprise LS2WS utility is nearly identical to the log file generated by IBM's CICS® TS LS2WS utility.
- The Micro Focus utility processing reflected in the log file exhibits the same configuration, program sequence, program elements, program optimizations, defects and missing features as the corresponding CICS® TS utility programs.
- Micro Focus's WSBIND file is encoded in EBCDIC[3]—like IBM's—yet, Micro Focus has no need for using that encoding as it uses an ASCII environment.

(Id.). IBM contends these similarities show Micro Focus copied elements of CICS TS to create

the Micro Focus Enterprise Suite, because "[t]here is no way such extensive similarity could

arise through attempts to meet similar functional requirements, or as a result of coincidence."

(Id.).

IBM allegedly terminated Micro Focus's involvement in the Developer Discount

Program as of August 31, 2022, by sending a Notice of Non-Renewal on May 31, 2021.

---

[3]     The Court understands "EBCDIC" to mean "extended binary-coded decimal interchange code," which is a "data-encoding system, developed by IBM and used mostly on its computers, that uses a unique eight-bit binary code for each number and alphabetic character as well as punctuation marks and accented letters and nonalphabetic characters." EBCDIC, Britannica.com, https://www.britannica.com/topic/EBCDIC (last visited May 30, 2023).

II.    Kirkland's Representation of Micro Focus

Micro Focus claims Kirkland—counsel to IBM in this action—is currently counsel to Micro Focus on United States matters such as IP-related transactions and agreements secured by IP, financing matters, and Micro Focus's pending acquisition by a third party, OpenText Corporation.  Micro Focus contends Kirkland began representing it as early as 2016 and most recently provided advice to Micro Focus in September 2022.

Christopher Swiss, Micro Focus's Treasurer, attests Kirkland did not advise Micro Focus that Kirkland would be involved in this action and that Micro Focus has not consented to Kirkland's representation of IBM.  (Doc. #24 ¶ 5).

There are two relevant agreements, each of which Kirkland contends was carefully negotiated.  First, Micro Focus's international affiliate, Micro Focus International PLC, and Kirkland executed an engagement letter, which was signed by Micro Focus International PLC's Executive Chairman on August 12, 2016 ((Doc. #67-1 (the "Engagement Letter")).  Approximately five years later, Kirkland and Micro Focus LLC executed a Master Retention Agreement (Doc. #68-1 (the "Retention Agreement")).[4]  An Associate General Counsel for Micro Focus LLC digitally signed the Retention Agreement on November 18, 2021.  (Doc. #68 ¶ 3).

The Engagement Letter provides, in pertinent part:

> We may be requested to act for other current or future clients on other matters where the interests of those other clients may be adverse to you. And we may currently be involved in such representations. You agree that we may represent such other clients in any existing or future matters that are directly adverse to you provided such matters are not substantially related to the legal services that we are rendering or will render to you in the Engagement; and provided further that none of William Sorabella, David Feirstein, Dean Shulman, Ian John or Chris Butler

---

[4]     The parties do not dispute that the Retention Agreement is binding on defendant Micro Focus (US), Inc.

would be involved in any way with regard to such matters (an "Allowed Adverse Representation"). By way of example, such Allowed Adverse Representations might take the form of, among other contexts: litigation (including arbitration, mediation and other forms of dispute resolution); transactional work (including consensual and non-consensual M&A transactions); counselling (including advising direct adversaries and competitors); and restructuring (including bankruptcy, insolvency, financial distress, recapitalization, equity and debt workouts, and other transactions or adversarial adjudicative proceedings related to any of the foregoing and similar matters).

You will not assert that our representation of you is a basis to disqualify us from an Allowed Adverse Representation or that our work for another client breaches any duties to you. Nor will you assert that a matter is substantially related, and thus not an Allowed Adverse Representation, simply because during our work we came to possess confidential information (recognizing, of course, that we will abide by our legal and ethical duties to protect your confidences).

You have considered the pros and cons of waiving conflicts of interests and recognize the inherent uncertainty about the array of potential matters and clients we might take on, but nonetheless have decided, with the opportunity to consult other counsel, that to secure our services instead of another firm, it is in your interest to waive conflicts of interest as described above.

(Engagement Letter at 2–3).

The Retention Agreement provides, in pertinent part: "The terms of the [Engagement Letter] shall govern regarding conflicts of interest (including which entities are clients) and shall supersede this [Section 11: Conflicts of Interest] to the extent there is any conflict." (Retention Agreement ¶ 11.1). It further provides Kirkland "will endeavor to disclose in writing any conflicts to Micro Focus Counsel to the extent permissible under the applicable rules of professional conduct and the Firm's confidentiality obligations to their other clients, in each case, before providing services to Micro Focus or signing any Engagement Letter [with Micro Focus] and as soon as the conflict is known to" Kirkland. (Id. ¶ 11.3).

Both parties submit declarations describing the scope of the work Kirkland performed for Micro Focus, as summarized below.

6

In 2014, Kirkland prepared a legal due diligence memorandum for Micro Focus in connection with a potential acquisition, assessing licensing and other agreements the target company had with IBM. (Doc. #84 ¶ 7).

In 2017 and 2018, Kirkland provided Micro Focus with transactional advice related to Micro Focus's 2017 acquisition of part of Hewlett Packard Enterprises (the "HPE Acquisition"), including significant diligence relating to the intellectual property in the HPE Acquisition. (Doc. #84 ¶ 8). Aaron Lorber, a Kirkland attorney who worked on those matters for Micro Focus, states "[n]either the complaint nor the motion [to disqualify Kirkland] suggests that the intellectual property at issue in [the instant case] was acquired by Micro Focus during the HPE transaction." (Doc. #70 ¶ 6). After the HPE Acquisition, Mr. Lorber worked on certain debt and security interest grants and releases, but he "never learned anything about the" Micro Focus Enterprise Suite. (Id. ¶ 7).

In July 2017, Stirling Adams, former Vice President and Associate General Counsel, Intellectual Property, at Micro Focus, "provided a list of all Micro Focus patents" to Kirkland attorney Mary Liz Brady, and helped her "to update lists of Micro Focus's trademarks, patents, and copyrights." (Doc. #82 ¶ 5). He also worked with Ms. Brady, Mr. Lorber, and Osaro Aifuwa, an attorney in Kirkland's Houston office, to "update lists of Micro Focus IP for disclosures to Micro Focus's lenders" in 2020, 2021, and 2022. (Id. ¶ 6).

Kirkland also represented Micro Focus in two federal securities class actions filed in 2018. (See Docs. ##24-1–24-4). Matthew Solum, the lead Kirkland partner for those actions, attests the litigation "stemmed from Micro Focus's issuance of American Depository Receipts in September 2017," and did not involve the intellectual property at issue in this action. (Doc. #68 ¶¶ 5, 8). Mr. Swiss, Micro Focus's treasurer, contends Kirkland received confidential

information about Micro Focus's finances and corporate structure in connection with the securities litigation.  (Doc. #24 ¶¶ 8, 10).

In 2018 and 2020, Kirkland represented Micro Focus in a restructuring, during which Mr. Swiss contends Kirkland received "confidential information relating to debt-related contractual provisions such as buy-back clauses" and provided "advice relating to internal intellectual property cross-licenses," which involved "a review of Micro Focus's entire intellectual property structure and licenses."  (Doc. #24 ¶ 11).

In 2019, Dale M. Cendali, a Kirkland attorney who represents IBM in this action, and other Kirkland attorneys (including Mr. Lorber) advised Micro Focus regarding intellectual property in a product Micro Focus acquired in the HPE Acquisition.  According to Carolyn Adler, Micro Focus's Vice President and Associate General Counsel for Commercial Legal, Micro Focus provided Kirkland with confidential information in connection with that product, including "the identity of its customer, the customer's business dealings, the customer's use of the product, and information about advice received from Micro Focus's UK lawyers."  (Doc. #83 ¶ 8).

In March 2021, Kirkland represented Micro Focus in a patent infringement lawsuit in the Eastern District of Texas involving Micro Focus products that enable mobile application developers to test their applications (the "Wapp Tech Action").  Mr. Swiss attests this litigation involved Micro Focus's "confidential business and technical information."  (Doc. #24 ¶ 9).  Mr. Solum, a Kirkland attorney, attests Kirkland's representation concerned Micro Focus's potential appeal of an adverse jury verdict.  (Doc. #68 ¶ 9).  However, Mr. Solum contends the matter was settled before an appeal was taken, and that the intellectual property involved in the instant action was not involved in the Wapp Tech Action.

Importantly, Micro Focus sought Kirkland's legal advice in 2021 after IBM accused

Micro Focus of patent infringement.  According to Mr. Adams, Kirkland attorney John O'Quinn

informed Micro Focus that Kirkland could not provide such advice to Micro Focus due to

"contemplated actual adversity with IBM." (Doc. #82 ¶ 7).  However, Mr. Adams claims Mr.

O'Quinn offered to "think it through as a 'hypothetical issue'" and "advised [Micro Focus] on

responding to IBM's infringement accusations." (Id.).[5]  Conversely, Mr. O'Quinn attests he

spoke briefly with Mr. Adams as a "professional courtesy," summarizing certain "widely known

and straightforward" principles without "apply[ing] these general principles to any particular

facts." (Doc. # 91-1 ¶ 4).  Mr. O'Quinn further attests "the Micro Focus lawyers did not provide

[him] with any confidential information about the nature of any dispute," and that he did not bill

Micro Focus for the call. (Id.).

In late 2021, Micro Focus sought advice from Kirkland "concerning the implications on

[Micro Focus's] . . . external credit agreement of a proposed internal restructuring of . . .

intellectual property" and provided Kirkland with "a high level explanation regarding the

ownership rights and licensing rights of its intellectual property." (Doc. #85 ¶ 5).  Jonathan

Vine, Micro Focus's Director of Tax Strategy, attests Kirkland was party to correspondence with

Micro Focus's United Kingdom counsel that disclosed the value of software connected to an

unspecified contract.

Kirkland also advised Micro Focus "on a $100 million debt buy-back deal" in summer

2022, during which Kirkland gained knowledge of Micro Focus's "financial structure, business

strategies, and market position." (Doc. #24 ¶ 12).  Mr. Swiss also attests that "[a]s late as

---

[5]     IBM filed, under seal, an unredacted copy of the relevant email correspondence. (Doc.
#89-2).

October 24, 2022, . . . Kirkland invoiced Micro Focus for work advising on Micro Focus's senior debt, which included work by Kirkland's debt and finance team to prepare an intellectual property security package, which again necessitated identifying all of Micro Focus's IP." (Doc. #84 ¶ 10).

Finally, Micro Focus contends Kirkland has been advising Micro Focus in connection with the OpenText acquisition.  Mr. Swiss attests that, on August 26, 2022, the day after the OpenText deal was publicly announced, he participated in a conference call with Mr. Aifuwu and another Kirkland attorney, Christopher Butler, to seek advice on how certain provisions in the deal could impact Micro Focus's debt and financial structuring.  (Doc. #24 ¶ 21).  Mr. Butler, however, claims Mr. Swiss's description of Kirkland's work on OpenText is inaccurate.  He attests Kirkland only responded to a discrete legal question during that call, that Kirkland does not serve as Micro Focus's transaction counsel for the OpenText transaction, and that his work has not involved details about particular Micro Focus products or intellectual property.  (Doc. #69 ¶¶ 4, 5).

Separately, Joshua L. Simmons, the lead Kirkland attorney for IBM in the instant action, attests IBM is "a long-time Kirkland client that regularly hires Kirkland to perform a wide variety of legal work, including . . . intellectual property litigations." (Doc. #71 ¶ 2).  He states he and Ms. Cendali "each did a minimal amount of work for Micro Focus years ago" but this work "concerned issues entirely unrelated to the matters in this litigation." (Id. ¶ 10).  In fact, Mr. Simmons attests he does not remember the prior work for Micro Focus.  (Id.)  Further, Mr. Simmons contends that, "[b]ased on Micro Focus's description [of Kirkland's prior work for Micro Focus], I do not see a connection between the IBM Matter and the work Kirkland has done for Micro Focus." (Id. ¶ 9).

Mr. Lorber attests Kirkland has "erected an ethical screen to ensure there is no exchange of information between the attorneys who represent Micro Focus and the attorneys who represent IBM in" this action.  (Doc. #70 ¶ 13).  Mr. Simmons says he "confirmed with each of the lawyers working with me on the IBM matter . . . that no information Kirkland received in its representation of Micro Focus was used for the IBM case."  (Doc. #71 ¶ 11).

## DISCUSSION

I.     Motion to Dismiss

    A.     Rule 12(b)(6) Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

B.    Copyright Infringement Claim

Micro Focus argues IBM's copyright infringement claim must be dismissed because IBM fails to allege the WSBIND file is covered by the Registrations.[6]

Micro Focus also argues IBM failed to plead its entitlement to statutory damages and attorneys' fees because the amended complaint does not state when the allegedly infringing conduct commenced.

The Court disagrees.

1.    Legal Standard

To state a prima facie case of copyright infringement, a plaintiff must plausibly allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Abdin v. CBS Broad. Inc., 971 F.3d 57, 66 (2d Cir. 2020).

With respect to the first element, a plaintiff must show he "either hold[s] a valid copyright registration or [has] applied and been refused a registration as a prerequisite to" suing a defendant for infringing a copyright. Gattoni v. Tibi, LLC, 254 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (collecting cases).  "A certificate of copyright registration is prima facie evidence of ownership of a valid copyright, but the alleged infringer may rebut that presumption."  Scholz Design, Inc. v. Sard Custom Homes, LLC, 691 F.3d 182, 186 (2d Cir. 2012); see also 17 U.S.C. § 410(c) ("the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate").

---

[6]    Micro Focus also claims IBM cannot state a copyright infringement claim because IBM failed to plead when the allegedly infringing conduct occurred.  The Court disagrees; IBM's allegations of a continuing infringement (FAC ¶ 35) are sufficient, at this stage, to avoid dismissal.  See, e.g., Blagman v. Apple Inc., 2013 WL 2181709, at *3 (S.D.N.Y. May 20, 2013) ("[C]opyright claims are not subject to particularity in pleading.").

"To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; <u>and</u> (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work." <u>Abdin v. CBS Broad. Inc.</u>, 971 F.3d at 66. "Rather than proving direct copying of a work, plaintiffs may also establish copying circumstantially by demonstrating that the Defendant had access to the copyrighted work at the time of the alleged infringement." <u>Klauber Brothers, Inc. v. QVC, Inc.</u>, 2020 WL 7029088, at *2 (S.D.N.Y. Nov. 30, 2020). As to substantial similarity, "[t]he standard test . . . is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." <u>Abdin v. CBS Broad. Inc.</u>, 971 F.3d at 66. "However, the ordinary observer standard has been called into question in evaluating claims of infringement of computer programs, which often involve 'highly complicated and technical subject matter that are likely to be somewhat impenetrable to lay observers' . . . and therefore may require expert testimony for substantial similarity to be evaluated accurately." <u>Automated Mgmt. Sys., Inc. v. Rappoport Hertz Cherson Rosenthal, P.C.</u>, 2022 WL 991755, at *7 (S.D.N.Y. Mar. 31, 2022) (quoting <u>Computer Assocs. Int'l, Inc. v. Altai, Inc.</u>, 982 F.2d 693, 713 (2d Cir. 1992)).

      2.     <u>Analysis</u>

Here, IBM pleads sufficient facts to state a copyright infringement claim.

First, IBM has adequately alleged it holds valid copyright registrations for nine versions of the CICS TS "computer program," including the WSBIND component of the program. (FAC ¶¶ 23–25, 27; <u>see</u> Registrations at 18). "It is well-established that computer programs are protected by copyright law as literary works." <u>Torah Soft Ltd. v. Drosnin</u>, 136 F. Supp. 2d 276, 284 (S.D.N.Y. 2001) (citing <u>Computer Assocs. Int'l, Inc. v. Altai, Inc.</u>, 982 F.2d at 702); <u>see also</u>

17 U.S.C. § 101 (defining a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result"). "At some later stage of the case, Plaintiff may be required specifically to prove that they possess copyrights on the [software] in question. However, at the pleading stage, inclusion of copyright certificates along with an assertion that they pertain to the [software] in question, is sufficient." Klauber Brothers, Inc. v. QVC, Inc., 2020 WL 7029088, at *3. Thus, at this early stage, IBM has sufficiently demonstrated it owns valid copyrights in the allegedly infringed works.

Second, IBM has adequately alleged Micro Focus copied the CICS TS computer program. Micro Focus allegedly had access to CICS TS for several years as a member of the PartnerWorld program and the Developer Discount Program. Further, IBM alleges several specific similarities between the CICS TS WSBIND file and Micro Focus Enterprise Suite's WSBIND file, including that "Micro Focus's WSBIND file uses IBM internal structures that are not available outside of IBM" and Micro Focus's utility processing, as reflected in a log file generated from its LS2WS utility, "exhibits the same configuration, program sequence, program elements, program optimizations, defects and missing features as the corresponding CICS® TS utility programs." (FAC ¶ 38). And according to IBM, "[t]here is no way such extensive similarity could arise through attempts to meet similar functional requirements, or as a result of coincidence." (Id.). IBM further alleges the similarities between the parties' respective WSBIND files show Micro Focus copied other, related components of the CICS TS program. These allegations satisfy IBM's burden to plead actual copying and substantial similarity. See Yeda Rsch. & Dev. Co. v. iCAD, Inc., 2019 WL 4562409, at *4 (S.D.N.Y Sept. 5, 2019) (plaintiff stated copyright infringement claim when the defendant allegedly had access to plaintiff's source code through a license agreement and defendant's software had "the same

intended use, fundamental scientific technology, and characteristics as" other programs using plaintiff's source code).

Accordingly, IBM has stated a copyright infringement claim.

      3.    <u>Statutory Damages and Attorneys' Fees</u>

The Copyright Act permits a copyright owner "to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work." 17 U.S.C. § 504(c)(1). A copyright owner pursuing a claim for copyright infringement may also recover costs and reasonable attorneys' fees. 17 U.S.C. § 505. However, statutory damages and attorneys' fees are not available to a copyright owner if: (i) the infringement "commenced before the effective date of . . . registration" for an unpublished work; or (ii) the infringement "commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412.

IBM attached to the amended complaint registration certificates for nine versions of CICS TS, with effective dates of registration ranging from February 18, 2004, to July 2, 2014. The certificates indicate eight of these versions were registered within three months of publication. (<u>See</u> Registrations at ECF 2–8; 12–26). Thus, IBM may be entitled to attorneys' fees and statutory damages for copyright infringement as to those eight works, regardless of when the infringement occurred.

However, the ninth work at issue here, CICS TS Version 3.2, was first published on June 20, 2007, and registered nearly six months later, on December 3, 2007. (<u>See</u> Registrations at ECF 9–10). Thus, if Micro Focus began infringing IBM's copyright in Version 3.2 before

December 3, 2007, IBM would not be entitled to statutory damages or attorneys' fees for any infringement of that version.

IBM does not allege precisely when the infringement occurred, only that Micro Focus allegedly "had access to IBM software for nearly the last two decades" and "copied at least the IBM CICS® TS software sometime within this access period." (FAC ¶ 35). It is plausible, drawing all reasonable inferences in IBM's favor, that Micro Focus's alleged infringement of Version 3.2 began on or after December 3, 2007. Thus, it would be premature to preclude IBM from seeking statutory damages and attorneys' fees before discovery could reveal when the alleged infringement of Version 3.2 began.

Accordingly, IBM has sufficiently pleaded its entitlement to statutory damages and attorneys' fees.

C.    Breach of Contract Claim

Micro Focus argues IBM's breach of contract claim is preempted by the Copyright Act. The Court agrees.

1.    Legal Standard

"Section 301 of the Copyright Act expressly preempts a state law claim only if (i) the work at issue 'comes within the subject matter of copyright' and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'" Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 429 (2d Cir. 2012) (quoting 17 U.S.C. § 301(a)). The first requirement is referred to as the "subject matter requirement." Id. at 429–30. The second is referred to as the "equivalency requirement," id. at 430–31, or the

"general scope requirement." ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022) (summary order), petition for cert. filed, (U.S. filed Aug. 5, 2022).[7]

"[T]he subject matter requirement looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work come within the subject matter of copyright as specified by sections 102 and 103" of the Copyright Act. ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *2. "Section 301's preemption scheme . . . includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection" to the entire work at issue. Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d at 430.

For example, the Second Circuit has held that President Ford's memoirs were within the subject matter of copyright, even though they "contained uncopyrightable facts." Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d at 429. Accordingly, "[a] work need not consist entirely of copyrightable material in order to meet the subject matter requirement, but instead need only fit into one of the copyrightable categories in a broad sense." Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). In analyzing the subject matter requirement, courts "focus on the gravamen of the claim and the allegations supporting it." ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *2.

For purposes of the equivalency requirement, "a state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights" afforded by the Copyright Act. Universal Instruments Corp. v Micro Sys. Eng'g, Inc., 924 F.3d 32, 48 (2d. Cir. 2019). Those exclusive rights are the rights

---

[7]     On December 12, 2022, the Supreme Court invited the solicitor general to file a brief expressing the views of the United States in ML Genius Holdings LLC v. Google LLC, 143 S. Ct. 522 (2022) (mem.).

"to reproduce the work, prepare derivative works, distribute the work to the public, perform the work, display the work, and perform the work by means of digital transmission." New London Assocs., LLC v. Kinetic Social LLC, 384 F. Supp. 3d 392, 406 (S.D.N.Y. 2019) (quoting John Wiley & Sons, Inc. v. DRK Photo, 882 F.3d 394, 402 (2d Cir. 2018)); see also 17 U.S.C. § 106.

However, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, there is no preemption." Universal Instruments Corp. v Micro Sys. Eng'g, Inc., 924 F.3d at 48.  To determine if the state law claim involves an extra element, courts examine "what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Id.

The Second Circuit "take[s] a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306.  "[I]f unauthorized publication is the gravamen of the plaintiffs' claim, then it is clear that the right they seek to protect is coextensive with an exclusive right already safeguarded by the Act—namely, control over reproduction and derivative use of copyrighted material." ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *3.

For example, "[e]lements such as awareness or intent do not save a claim from preemption because they alter the action's scope but not its nature." ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *3.  But state law claims involving a breach of a fiduciary duty or breach of a contractual promise to pay for use of a work are not preempted. See id.; see also Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d at 49.  In addition, the Second Circuit recently rejected "a per se rule that all breach of contract claims are exempt from

preemption," instead instructing courts to evaluate "holistic[ally]" the nature of the rights sought to be enforced by the breach of contract claim when applying the equivalency requirement. ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *4.

      2.    Analysis

Here, IBM's breach of contract claim is preempted by the Copyright Act.

First, the breach of contract claim meets the subject matter requirement because IBM alleges Micro Focus breached the parties' agreements by exceeding its license to use IBM's software. In particular, Micro Focus allegedly reverse engineered and "cop[ied] IBM's copyrighted software, create[ed] a derivative work, and then promot[ed] and profit[ed] from that pirated software." (FAC ¶ 46; see also id. ¶¶ 4, 38). As noted above, software is protected as a literary work under the Copyright Act. Therefore, the works at issue for the breach of contract claim—several versions of the CICS TS program—come within the subject matter of copyright.

IBM argues the subject matter requirement is not satisfied because Micro Focus allegedly breached a promise "not to undermine IBM's mainframe systems," which include non-copyrightable hardware. (Doc. #78 ("MTD Opp.") at 7). However, IBM does not claim Micro Focus reverse-engineered, copied, or reproduced IBM's hardware. The work that is the subject matter of IBM's claims is software, which falls squarely within "the broad ambit of the subject matter categories" of copyright. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306; see also ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *3 (breach of contract claim preempted when "the subject matter of [plaintiff's] claims is the content that appears on [plaintiff's] website . . . because those are the works against which it claims rights"). Therefore, the subject matter requirement for preemption is met.

Second, the rights IBM seeks to protect through its breach of contract claim are equivalent to exclusive rights protected by the Copyright Act.  The gravamen of each contract provision IBM alleges Micro Focus breached—to "not us[e] any of the elements of the Program or related licensed material separately from the Program," not to "reverse assembl[e], reverse compil[e], translat[e], or reverse engineer[ ] the Program," "not to use [Micro Focus's] preferred access and the IBM software licensed to them . . . to undermine IBM's mainframe systems, and instead use their access solely to develop or enhance the software" (FAC ¶¶ 63–65)—is to prohibit Micro Focus from infringing IBM's exclusive rights to copy and distribute its software. Thus, the breach of contract claim "is simply a restatement of [IBM's] claims under the Copyright Act for unlawful copying and distribution." New London Assocs., LLC v. Kinetic Soc. LLC, 384 F. Supp. 3d at 411 (conversion claims preempted when defendants allegedly "converted [plaintiff's] computer hardware, software, and intellectual property" for defendants' own use).  In short, IBM's breach of contract claim is not "qualitatively different from a copyright infringement claim," In re Jackson, 972 F.3d 25, 53 (2d Cir. 2020), and the equivalency requirement for preemption is met.

Accordingly, IBM's breach of contract claim is preempted by the Copyright Act and must be dismissed.  ML Genius Holdings LLC v. Google LLC, 2022 WL 710744, at *1 ("Once a district court determines that a state law claim has been completely preempted by the Copyright Act . . . the court must then dismiss the claim for failing to state a cause of action.").

II.     Motion to Disqualify Counsel

A.     Legal Standard[8]

"The court has the inherent authority to supervise the professional conduct of attorneys appearing before it, including the power to disqualify an attorney from a representation." In re Fisker Auto. Holdings, Inc. S'holder Litig., 2018 WL 3991470, at *2 (D. Del. Aug. 9, 2018).

Despite this inherent power, motions to disqualify counsel "are generally disfavored." Bos. Sci. Corp. v. Johnson & Johnson, Inc., 647 F. Supp. 2d 369, 373 (D. Del. 2009). "[D]isqualification is a severe sanction," and "is never automatic," even if a court determines an attorney's conduct violated an applicable disciplinary rule. Elonex I.P. Holdings, Ltd. v. Apple

---

[8]     The Retention Agreement provides it "will be governed by and construed in accordance with the laws of Delaware without regard to its conflict of law principles." (Retention Agreement ¶ 15.4).  Because Micro Focus's motion to disqualify Kirkland arises from Kirkland's representation of Micro Focus pursuant to the Retention Agreement, and resolution of the motion requires interpreting the Retention Agreement, Delaware law applies to the instant motion.  See Yak v. BiggerPockets, L.L.C., 2022 WL 67740, at *3 (2d Cir. Jan. 7, 2022) (choice-of-law clauses that indicate "the contract will be governed by a certain body of law . . . . are not broad enough to reach claims that are only incidental to the contractual relationship" but do reach claims when "resolution . . . relates to interpretation of the contract" or "the right asserted . . . arise[s] from the contract"); see also Fin. One. Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 333 (2d Cir. 2005) ("New York courts decide the scope of [choice-of-law] clauses under New York law.").

Nevertheless, even if New York law applied, the Court would deny the motion to disqualify because, as Micro Focus notes, "there is no meaningful difference between New York and Delaware law on these issues." (Doc. #80 at 2 n.2); see Bd. of Educ. of N.Y. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) (disqualification only warranted under New York law if an "attorney's conduct tends to taint the underlying trial"); see also GSI Com. Sols., Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 209 (2d Cir. 2010) ("Because concurrent representation is 'prima facie improper,' it is incumbent upon the attorney to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation."); Goodwine v. City of New York, 2016 WL 379761, at *2 (S.D.N.Y. Jan. 29, 2016) (In determining whether disqualification is appropriate, "a court may consult the disciplinary rules of the American Bar Association and New York State, but those rules are not binding authority," and "not every violation of a disciplinary rule will necessarily lead to disqualification.").  The Court also notes "Kirkland has no objection to this Court resolving the [motion to disqualify] in this forum" pursuant to Delaware law.  (Doc. #66 at 5 n.2).

Comput., Inc., 142 F. Supp. 2d 579, 583 (D. Del. 2001); see also In re Boy Scouts of Am., 35

F.4th 149, 160 (3d Cir. 2022) (collecting cases when district courts in the Third Circuit "den[ied]

disqualification even when finding or assuming conflicts under the professional conduct rules,"

including violations of the applicable concurrent conflict rule).  Thus, "[e]ven when an ethical

conflict exists (or is assumed to exist), a court may conclude based on the facts before it that

disqualification is not an appropriate remedy."  Id.

      Accordingly, in considering a motion to disqualify an attorney, "a district court has wide

discretion," and "[t]he party seeking disqualification must clearly show that continued

representation would be impermissible."  Elonex I.P. Holdings, Ltd. v. Apple Comput., Inc., 142

F. Supp. 2d at 581, 583.  "The court should disqualify an attorney only when it determines, on

the facts of the particular case, that disqualification is an appropriate means of enforcing the

applicable disciplinary rule."  Bos. Sci. Corp. v. Johnson & Johnson, Inc., 647 F. Supp. 2d at 373

(quoting United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980)).  Moreover, the court

"should consider the ends that the disciplinary rule is designed to serve," which, in the case of an

alleged concurrent conflict of interest, are "to prevent divided loyalties and to protect against the

disclosure of client confidences."  End of Road Tr. v. Terex Corp., 2002 WL 242464, at **2–3

(D. Del. Feb. 20, 2002).

      B.    Relevant Disciplinary Rule

      Under Delaware law, "[a]ttorney conduct is governed by the ethical standards of the court

before which the attorney appears."  In re Fisker Auto. Holdings, Inc. S'holder Litig., 2018 WL

3991470, at *2.  Likewise, Rule 8.5(b)(1) of the New York Rules of Professional Conduct

provides the disciplinary rules "to be applied" for "conduct in connection with a proceeding in a

court . . . shall be the rules of the jurisdiction in which the court sits." Accordingly, the Court

refers to the New York Rules of Professional Conduct (the "New York Rules").

New York Rule 1.7(a) provides: "Except as provided in paragraph (b), a lawyer shall not

represent a client if a reasonable lawyer would conclude that . . . the representation will involve

the lawyer in representing differing interests." N.Y. Rules Prof'l Conduct 1.7(a). New York

Rule 1.7(b) provides:

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the same lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing.

N.Y. Rules Prof'l Conduct 1.7(b).

Comment 22 to Rule 1.7 discusses advance waivers of future conflicts. It provides "[t]he

effectiveness of advance waivers is generally determined by the extent to which the client

reasonably understands the material risks that the waiver entails." N.Y. Rules Prof'l Conduct 1.7

cmt. 22. "The adequacy of the disclosure necessary to obtain valid advance consent to conflicts

may also depend on the sophistication and experience of the client." Id. "[I]f the client is an

experienced user of the legal services involved and is reasonably informed regarding the risk that

a conflict may arise, an advance waiver is more likely to be effective, particularly if, for

example, the client is independently represented or advised by in-house or other counsel in

giving consent." Id. "Thus, in some circumstances, even general and open-ended waivers by

experienced users of legal services may be effective." Id.

C.     Analysis

Here, even assuming Kirkland's representation of Micro Focus and IBM constitutes a

concurrent conflict, it is a consentable conflict to which Micro Focus, a sophisticated user of

legal services, provided advance, informed consent in the Retention Agreement, and does not raise concerns about divided loyalty between clients or the breach of client confidences.

First, Kirkland has demonstrated it reasonably believes it can provide competent and diligent representation to each affected client because the services it provides to each client are largely distinct in scope and subject matter and it has taken measures to protect confidential information from being shared within the firm. See N.Y. Rules Prof'l Conduct 1.7(b)(1).

Kirkland attorney Mr. Simmons attests IBM is a "long-time Kirkland client that regularly hires Kirkland to perform a wide variety of legal work." (Doc. #71 ¶ 2). Conversely, Kirkland attorney Mr. Lorber attests "Micro Focus has for some time not engaged Kirkland for new projects and Kirkland's recent work for Micro Focus involves the continuation of legacy projects." (Doc. #70 ¶ 9). This is consistent with the way both parties describe the work Kirkland has performed for Micro Focus, which during the past two years, has focused primarily on debt or financing-related advice or counseling on litigations unrelated to the Micro Focus Enterprise Suite. Although some of Kirkland's advice to Micro Focus involved Micro Focus's intellectual property, the record does not reflect this advice involved the Micro Focus Enterprise Suite or Micro Focus's participation in IBM's PartnerWorld or Developer Discount programs. In fact, in 2021, when Micro Focus sought advice from a Kirkland attorney, who does not represent IBM in this matter, regarding a potential infringement action by IBM, Micro Focus was advised Kirkland represents IBM and such action would involve "actual adversity" with Micro Focus. (Doc. #82 ¶ 7). Therefore, here, "the risks present in most concurrent representation— that is, a risk of divided loyalty to each client or an imposition on the independent judgment on [Kirkland's] part, are not great in this case." In re Fisker Auto. Holdings, Inc. S'holder Litig., 2018 WL 3991470, at *4; see Elonex I.P. Holdings, Ltd. v. Apple Comput., Inc., 142 F. Supp. 2d

at 582 (denying disqualification when the lawyer "could reasonably serve both client's interests" and "even assuming there is an impermissible conflict of interest," the objecting client waived it through a prospective waiver).

Moreover, Kirkland has erected an ethical screen to avoid exchanges of information between attorneys working for each client, and Mr. Simmons attests no information received during Kirkland's representation of Micro Focus was used in this case.  (Doc. #71 ¶ 11); see In re Boy Scouts of Am., 630 B.R. at 137 (affirming bankruptcy court's decision to deny disqualification when law firm erected an ethical screen because "the screen provided further assurance that confidential information regarding [the objecting client's] matters had not been and, importantly, would not be shared with" other lawyers in the firm).  Accordingly, "the potential for breached confidences is minimal." End of Road Tr. v. Terex Corp., 2002 WL 242464, at **2, 3 (rejecting "vague and unsupported" allegations that an attorney's ethical screen would be ineffective).  Thus, Kirkland has established it reasonably believes it can provide competent representation to Micro Focus and IBM.

Second, Micro Focus agreed in writing that Kirkland may represent, or may already represent, parties in litigation directly adverse to Micro Focus, so long as such matters are not substantially related to Kirkland's representation of Micro Focus.  "[T]he commonly acknowledged intent of such prospective waivers in the context of the legal representation of . . . intellectual property matters . . . , is to enable competitor clients to retain the services of a limited, select group of counsel with particular qualifications, expertise, and valuable accoutrements, to obtain the perceived advantage of such counsel's representation as to discrete (typically unrelated) products." Mylan v. Kirkland & Ellis LLP, 2015 WL 12733414, at *19 (W.D. Pa. June 9, 2015) (recommending Kirkland's disqualification when "the conflicting

representation [was] not restricted to an unrelated discrete product but, much to the contrary, encompasse[d] a hostile, opposed acquisition of" another Kirkland client, including "the very products as to which K&E ha[d] received confidential and proprietary information" and the waiver provision in the complaining client's retainer agreement "ma[de] no mention of acquisitions").

Here, the language of the Retention Agreement is adequate to inform Micro Focus of the material risks that the waiver entailed, including that, by agreeing to that provision, Micro Focus was consenting to Kirkland representing a client directly adverse to Micro Focus in a litigation. See In re Fisker Auto. Holdings, Inc. S'holder Litig., 2018 WL 3991470, at *3 (denying disqualification when retainer agreement provided the firm "can continue to represent, or can in the future represent, existing or new clients in any matter, including litigation or other adversarial proceedings . . . so long as the Other Matters are not substantially related to our work for you on the [specific matter], even if those other clients' interests are adverse to you in the Other Matters").

Moreover, the matters in which Kirkland represents or represented Micro Focus—in sum, diligence on a target Micro Focus potentially wanted to acquire in 2014; transactional advice in connection with the HPE Acquisition, including advice on HP intellectual property unrelated to the Micro Focus Enterprise Suites; securities class actions arising from the issuance of American Depository Receipts; debt-related buyback work in 2018 and 2020; a patent infringement action regarding separate intellectual property; and debt and financial structuring-related advice, including in connection with the OpenText deal—are not substantially related to IBM's claims that Micro Focus copied the CICS TS software because none of the matters in which Kirkland advised Micro Focus focused on, or perhaps even touched on, creation or distribution of the

26

Micro Focus Enterprise Suite software.  Therefore, there is a low possibility that "confidential information that might have been gained in the first representation may be used to the detriment of [Micro Focus] in" this lawsuit.  <u>Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.</u>, 491 F. Supp. 2d 510, 515 (D. Del. 2007).

Further, Micro Focus is an international technology company and a sophisticated user of legal services, and the Retention Agreement—which incorporates by reference the advance waiver in the Engagement Letter—was signed by an in-house attorney of Micro Focus.  <u>See</u> <u>In re Fisker Auto. Holdings, Inc. S'holder Litig.</u>, 2018 WL 3991470, at *3 ("sophisticated users of legal services are held to a higher standard when giving consent regarding future conflicts unrelated to the subject of the representation").

For all these reasons, the Court concludes Micro Focus gave advance, informed consent, in writing, to the potential for this concurrent conflict.[9]

Accordingly, the motion to disqualify Kirkland as IBM's counsel is denied.[10]

---

[9]   Micro Focus does not argue Kirkland's representation of IBM is prohibited by law and this action does not involve Kirkland representing both IBM and Micro Focus in the same litigation.  <u>See</u> N.Y. Rules Prof'l Conduct 1.7(b)(2), (3).

[10]   Both parties submitted declarations and opinions of legal ethics experts in support of their motion papers.  The Court did not consider any of these submissions in rendering this decision.  <u>See</u> <u>Bernstein v. Bernstein Litowitz Berger & Grossmann LLP</u>, 814 F.3d 132, 144 (2d Cir. 2016) ("the court was not compelled to accept a legal-ethics expert's declaration regarding whether an ethical duty had been triggered, because the question was for the court to decide" (quoting <u>Amnesty Int'l USA v. Clapper</u>, 638 F.3d 118, 128 n.12 (2d Cir. 2011), <u>rev'd on other grounds</u>, 568 U.S. 398 (2013))).

CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

IBM's copyright infringement claim shall proceed.

IBM's breach of contract claim is dismissed.

By June 13, 2023, Micro Focus shall file an answer.

The motion to disqualify IBM's counsel is DENIED.

Given that the Court has relied upon material that remains under seal, the Court is

releasing this Opinion and Order under seal, pending review by the parties. In the unlikely event

the parties believe that certain material in this Opinion and Order should be redacted, counsel

should jointly submit a proposed redacted version by no later than June 9, 2023. After reviewing

the parties' submission, the Court will subsequently issue a publicly available version of its

Opinion and Order.

Dated: May 30, 2023
        White Plains, NY                        SO ORDERED:


                                                Vincent L. Briccetti
                                                United States District Judge